## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

LORI HELING,

                              Plaintiff,

v.

CREDITORS COLLECTION SERVICE, INC.,

                              Defendant.

Case No. 15-CV-1274-JPS

ORDER

## 1.      INTRODUCTION

On June 14, 2016, the defendant Creditors Collection Service, Inc., ("CCS") filed a motion for summary judgment on all of the plaintiff Lori Heling's ("Heling") claims. (Docket #20). CCS contemporaneously filed a brief in support of the motion, statement of facts, and various affidavits with exhibits thereto. (Brief in Support, Docket #21; Statement of Facts, Docket #22; Affidavits of Nancy Wagner, Andrew Morgan, Donald Waage, and Vicky Barclay, Docket #23, #24, #25, and #26, respectively). On August 5, 2016, Heling filed a brief in opposition to CCS's motion, a response to CCS's statement of facts, and a statement of additional facts with exhibits thereto. (Brief in Opposition, Docket #33; Response to Statement of Facts, Docket #32 at 1-13 ("RSOF"); Statement of Additional Facts, Docket #32 at 13-19). Finally, on August 10, 2016, CCS submitted a reply in support of its motion and a response to Heling's statement of additional facts. (Reply in Support, Docket #37; Response to Statement of Additional Facts, Docket #38 at 17-29 ("RSAF")). The motion is fully briefed and, for the reasons explained below, it will be denied in its entirety.

## 2.      STANDARD OF REVIEW

Federal Rule of Civil Procedure ("FRCP") 56 provides the mechanism for seeking summary judgment. Rule 56 states that the "court shall grant

summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). A "genuine" dispute of material fact is created when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court construes all facts and reasonable inferences in a light most favorable to the non-movant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016). In assessing the parties' proposed facts, the Court must not weigh the evidence or determine witness credibility; the Seventh Circuit instructs that "we leave those tasks to factfinders." *Berry v. Chicago Transit Authority*, 618 F.3d 688, 691 (7th Cir. 2010). Internal inconsistencies in a witness's testimony "create an issue of credibility as to which part of the testimony should be given the greatest weight if credited at all." *Bank of Illinois v. Allied Signal Safety Restraint Systems*, 75 F.3d 1162, 1170 (7th Cir. 1996) (quoting *Tippens v. Celotex Corp.*, 805 F.2d 949, 953 (11th Cir. 1986)). The non-movant "need not match the movant witness for witness, nor persuade the court that [their] case is convincing, [they] need only come forward with appropriate evidence demonstrating that there is a pending dispute of material fact." *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 921 (7th Cir. 1994).

3.     FACTS

The Court will address the parties' ancillary motions relevant to the facts, then the facts themselves.

3.1     CCS's Admissions

CCS moves to withdraw its admissions to Heling's requests for admission, which were deemed admitted by operation of FRCP 36(b). (Docket #39). That Rule further provides that admissions may be withdrawn

"if it would promote the presentation of the merits of the action and if the court is not persuaded that it would prejudice the requesting party in maintaining or defending the action on the merits." FRCP 36(b); *see Banos v. City of Chicago*, 398 F.3d 889, 892 (7th Cir. 2005). The Court finds that these elements are present. Allowing the admissions to stand would remove consideration of the merits of at least one of Heling's claims. (Docket #39 at 3). In her response, Heling does not directly explain how she would be prejudiced; it appears that she implies prejudice from her reliance on the admissions in responding to summary judgment. (Docket #41 at 3-4). In the Court's view, both parties are at fault for the present state of affairs, and FRCP 36(b) favors withdrawal. The Court will, therefore, grant the motion and permit CCS to withdraw its admissions to Heling's requests for admission numbered 8, 9, 11, 12, 17, 18, 21, 22, and 23. *See* (Docket #39 at 1).

### 3.2    Affidavit of Andrew Morgan

Heling moves to strike the affidavit testimony of Andrew Morgan ("Morgan"), the attorney who represented the creditor in the underlying state court collection lawsuit, and the exhibits attached thereto. (Docket #31). She claims that Morgan was never identified by CCS in its Rule 26(a)(1) disclosures or in interrogatory responses, and that, pursuant to FRCP 37(c)(1), CCS should not be allowed to use his testimony. *Id.*; (Docket #42 at 2-3). CCS responds that Heling identified Morgan in *her* Rule 26(a)(1) disclosures (and CCS's disclosures incorporate her identified witnesses by reference), and, in any event, she was well aware throughout this litigation that Morgan had information relevant to her claims. (Docket #40). Additionally, Heling failed to provide the good-faith "meet and confer"

certification required by the Local Rules.[1] *Id.*; Civil L. R. 37. Though Morgan appears to have been adequately identified in CCS's Rule 26(a)(1) disclosures by reference to Heling's own disclosures,[2] it failed to identify him in its interrogatory responses. (Docket #31-2 at 7-8). In fact, CCS makes no attempt to argue otherwise. *See generally* (Docket #40). The motion to strike will, therefore, be granted.

### 3.3 Relevant Facts

The Court will provide a timeline of events, noting the parties' disagreement where appropriate.[3] In accordance with the standard of review, the facts and inferences therefrom are construed in Heling's favor. Given the parties' disputes on nearly every proffered fact, the Court will attempt to limit this narrative to the facts material to its holdings.

The parties dispute whether CCS sent any letters to Heling prior to their interactions in fall 2015. CCS claims that its first letter was sent on October 17, 2014 (the "October Letter") when it received Heling's account from her creditor, a dentist named Dr. Delasanta ("Delasanta"). RSOF ¶¶ 6-7; RSAF ¶ 31.[4] Heling counters that CCS did not identify such a letter in its interrogatory responses, and CCS's account notes have no entry

---

[1]This is an interesting point for CCS to raise, as it did not include a proper certification in its own ancillary motion. *See generally* (Docket #39).

[2]Heling cannot claim that referencing to another party's disclosures is improper—she did it herself. (Docket #40-1 at 3 and #42 at 1-2).

[3]The Court will not consider CCS's attempt to offer a reply in support of its own statement of facts. (Docket #38 at 1-17). Such a filing is not contemplated by the Local Rules. *See* Civil L.R. 56(b)(3)(B).

[4]Citations to the responsive fact documents are for brevity only; the cite may refer to material in the asserted fact, the response, and/or any reply.

corresponding to the letter. RSOF ¶¶ 6-7.[5] Further, for CCS to send the letter on the same day the account was received, it would need to generate the letter on a computer, print it, apply postage, and put it in the outgoing mail by 2:30 p.m. RSAF ¶ 42.

CCS asserts that it did identify the letter in discovery, and further states that additional letters were sent after that time, and none, including the first letter, were ever returned as undeliverable by the postal service. RSOF ¶ 8; RSAF ¶ 31. Only the first letter included certain disclosures contained in 15 U.S.C. § 1692g(a). RSAF ¶ 55; *see infra* Part 4.3. Heling never received any of the letters because she had not lived at the address to which they were sent for approximately five years. RSOF ¶ 8. Heling criticizes CCS for failing to make any efforts to validate the address, which had been provided to CCS by Delasanta. RSOF ¶¶ 7-8.

On April 23, 2015, Morgan filed a lawsuit against Heling on Delasanta's behalf to recover her debt for dental services. RSOF ¶¶ 6, 10. Heling notes that the summons, directed to her old address, was returned as undeliverable (Heling was eventually "served" by publication). RSAF ¶ 56. A judgment was obtained for $390.09 on June 1, 2015. RSOF ¶ 10. The judgment was docketed on June 8, 2015. RSOF ¶ 11. The parties dispute whether this triggered the accrual of post-judgment interest. RSOF ¶ 11. They also dispute the existence of yet another letter, this time dated June 17, 2015. RSOF ¶ 11. On July 21, 2015, Delasanta filed a garnishment request seeking $396.14, comprising the judgment amount, docketing fee, and post-

---

[5]The parties further dispute whether the account notes are a complete and accurate record of activity on Heling's account. Heling sometimes asserts that they are, in light of testimony to that effect by CCS's owner and employees, while CCS claims that the notes are not exhaustive. *See* RSOF ¶ 21; RSAF ¶ 41. Other times, Heling questions their accuracy. *See* RSOF ¶ 14, 16; RSAF ¶ 61.

judgment interest. RSOF ¶ 12. Estimated additional costs, including $20 of anticipated costs to file a satisfaction of judgment (the "satisfaction fee"), were included in the total $540.64 balance sought. RSOF ¶ 12.[6]

Heling's first notice of the debt was from her payroll department, informing her that the garnishment order had been received. RSAF ¶ 44-45. CCS argues Heling should have known about the debt as of the time she received the services, because she knew her insurance did not cover the entire balance. RSAF ¶ 44-45. Heling called Delasanta's office on July 27, 2015, to obtain more information about the debt. RSAF ¶ 46. She was apparently told to contact Morgan, who directed her on to CCS. RSAF ¶ 47. Heling claims she then called CCS that same day. RSAF ¶¶ 32, 48. CCS denies that the conversation occurred at all, as no CCS employee can recall it. RSAF ¶¶ 32, 48. Heling claims the conversation involved the debt balance, CCS's attempts to contact her, and her payment options. RSAF ¶¶ 48, 50-51.

Heling called CCS on August 3, 2015, and spoke with Nancy Wagner ("Wagner"). RSOF ¶ 14. Wagner kept contemporaneous notes of the conversation but Heling disputes whether they are accurate or exhaustive. RSOF ¶ 14; RSAF ¶ 59-60.[7] No audio recording of the call exists. RSAF ¶ 60. Heling indicated that she was aware of the garnishment and gave Wagner her current address, where she lived since 2013. RSOF ¶ 15; RSAF ¶ 52. CCS did not send any letters to that address after August 3, 2015. RSAF ¶ 58.

---

[6]Heling denies that Vicki Barclay, a CCS employee, has personal knowledge of the various additional charges. In any event, Heling does not appear to dispute that the amounts were actually *sought* by CCS, but instead challenges whether they were valid. This is of no moment for the purposes of this motion.

[7]This dispute over the account notes includes an alleged call to Heling prior to January 9, 2015, but CCS denies that a call occurred. RSAF ¶¶ 62, 65.

The parties dispute the remainder of the conversation. Heling says she expressed a willingness to pay the debt in exchange for having the judgment vacated, which CCS denies. RSAF ¶ 53. Wagner claims to have said that the summons in the collection suit was accomplished by "publication," and that CCS "would" not vacate the judgment. RSOF ¶¶ 15-16; RSAF ¶ 54. Heling recalls that when she asked about vacating the judgment, Wagner said she "could" not do so. RSOF ¶¶ 15-16; RSAF ¶ 54. Heling further questions Wagner's memory of the conversation given that when she was deposed, Wagner could not remember certain facts about her work from even the day before. RSAF ¶ 64. CCS admits that only Delasanta could make a decision about vacating the judgment. RSAF ¶¶ 40, 68-69.

Wagner says she told Heling that she owed a balance of $538.64 which included the satisfaction fee. RSOF ¶ 17. Heling asserts that the balance was provided without a breakdown of the various fees. RSOF ¶ 17. Specifically, Wagner claims to have represented that the satisfaction fee was optional, while Heling says that no such explanation occurred. RSOF ¶ 23. Heling questions whether the balance was accurate; namely, she contends that the satisfaction fee was not yet incurred as of the date of the conversation. RSOF ¶ 19. CCS's credit reporting item for the debt reflected a balance of $518.64 as of the date the garnishment request was filed. RSOF ¶ 19.

On August 28, 2015, CCS received the first garnishment check. RSOF ¶ 20. CCS asserts that "shortly before" September 17, 2015, Heling's employer called to determine a final payoff amount for the garnishment. RSOF ¶ 21. CCS offered two amounts, one with the satisfaction fee and one without, and the employer chose the option with the satisfaction fee included. RSOF ¶¶ 21, 24. Heling disputes whether the call occurred, because it is not reflected in the account notes, and Donald Waage, CCS's owner,

indicates that notes are usually made contemporaneously with an event relating to an account. RSOF ¶¶ 21, 24; RSAF ¶ 63.

4.    ANALYSIS

In the briefing and order on CCS's motion to dismiss, Heling's case was distilled to three separate Fair Debt Collection Practices Act ("FDCPA") claims:

     1.    CCS misrepresented the "character, amount, and/or legal status" of the judgment against Heling that CCS was collecting;

     2.    CCS incorrectly told Heling that the judgment against her could not be vacated; and

     3.    that CCS did not timely provide Heling with required written documentation regarding the debt.

*See* (Docket #17 at 1). CCS now seeks summary judgment as to each of those claims. Heling raises genuine issues of fact as to the second and third claims, but not the first.

Preliminarily, the Court notes that FDCPA violations are assessed from the perspective of an "unsophisticated consumer." *Lox v. CDA, Ltd.*, 689 F.3d 818, 822 (7th Cir. 2012). The *Lox* court described the standard:

> The unsophisticated consumer may be uninformed, naïve, and trusting, …but is not a dimwit, has rudimentary knowledge about the financial world, and is capable of making basic logical deductions and inferences[.] …[W]e treat the question of whether an unsophisticated consumer would find certain debt collection language misleading as a question of fact.

*Id.* (citations and quotations omitted).

     4.1    Misrepresentation of the Amount of the Judgment

The FDCPA generally prohibits "unfair or unconscionable" collection activity. 15 U.S.C. § 1692f. This includes "[t]he collection of any amount

(including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law." *Id.* at § 1692f(1). The FDCPA also proscribes "false, deceptive, or misleading representations," including "(2) [t]he false representation of…[the] amount…of any debt[.]" *Id.* at § 1692e and e(2)(A).

CCS says that the fees it added to the debt were authorized, and thus the $538.64 balance it quoted to Heling during the August 3, 2015 call was not false or misleading. (Docket #21 at 9-19). It cites various Wisconsin statutes which authorize various fees relating to collection suits and garnishment actions. *Id.* at 12-13. Along with the debt balance, CCS argues that as of August 3, 2015, the addition of various authorized fees resulted in a total balance of $538.64, precisely what Heling was told she owed. *Id.* at 14. CCS stresses that the costs added to the debt balance had already been incurred as of August 3, 2015. *Id.* at 15, 17-18; (Docket #37 at 4).

Heling maintains that CCS impermissibly included anticipated costs in its representation of the balance, namely the cost to file a satisfaction of judgment and post-judgment interest (her response seems to concede that the other fees were appropriately included). (Docket #33 at 16-19); *see Kaymark v. Bank of America, N.A.*, 783 F.3d 168, 176 (3d Cir. 2015). CCS counters that: 1) the post-judgment interest amount, $1.10, was not claimed as due during the call; and 2) it told Heling that she did not have to pay the $20.00 fee for filing the satisfaction of judgment, if she chose to file it herself. (Docket #21 at 14-15, 18-19). Heling replies that there is a dispute of fact as to whether CCS communicated that the satisfaction fee was optional. (Docket #33 at 19).

Heling is correct. The conversations of August 3, 2015, and September 17, 2015, are vigorously disputed, and Heling may have been told that the

satisfaction fee was optional in either of those. Though the e-mails she exchanged with Morgan seem to have clarified the point, they cannot be considered by the Court. (Docket #24-2 at 2). When viewing the facts in a light most favorable to Heling, a reasonable jury could believe her evidence and find that CCS overstated the amount of the debt in the August 3, 2015 conversation.

CCS makes two final arguments to avoid this result. First, it argues that the August 3, 2015 conversation was not a debt collection "communication" because it was initiated by Heling and CCS merely stated the amount of the debt. (Docket #37 at 4-5). The FDCPA defines a "communication" as "the conveying of information regarding a debt directly or indirectly to any person through any medium." 15 U.S.C. § 1692a(2). However, Sections 1692e and f seem to impose a higher standard, requiring the use of "any false, deceptive, or misleading representation or means *in connection with the collection of any debt*" or "unfair or unconscionable means *to collect or attempt to collect any debt.*" *Id.* at 1692e and f (emphasis added). The Seventh Circuit instructs that the relationship of parties, the purpose and context of a communication, and a demand for payment are relevant factors, and the ultimate resolution of the issue is a "question of objective fact[.]" *See Gburek v. Litton Loan Servicing LP*, 614 F.3d 380, 385-86 (7th Cir. 2010) (quoting *Ruth v. Triumph Partnerships*, 577 F.3d 790, 798-99 (7th Cir. 2009). As noted above, the parties dispute much of the conversation, including whether Heling offered to pay. They do not dispute that the conversation entailed a discussion of the balance due and vacating the judgment. It is reasonable to infer that an attempt to collect the debt was at least implied in these discussions. Thus, construing the facts and inferences in Heling's favor, the August 3, 2015 conversation was a debt collection communication.

Second, CCS claims that the misrepresentation of the debt balance was not material. *Wahl v. Midland Credit Management, Inc.*, 556 F.3d 643, 645-46 (7th Cir. 2009). A statement is material  if it has "the ability to influence a *consumer's* decision[.]" *Lox*, 689 F.3d at 826 (quoting *O'Rourke v. Palisades Acquisition XVI, LLC*, 635 F.3d 938, 942 (7th Cir. 2011) (emphasis in original)). The influence need not be enough to conclusively change the consumer's decision, but it must at least be "a factor in [their] decision-making process[.]" *Id.* at 827. Heling asserts that a misstatement of a debt balance could cause a consumer to pay more or sooner than they otherwise would have. (Docket #33 at 17). The Court agrees that overstating a debt balance *could* mislead an unsophisticated consumer; the final say on that point is left to the jury. Put another way, the Court concludes that the misrepresentation could have been a factor in Heling's decision-making process and, thus, it satisfies the materiality requirement.[8]

4.2     False Statement that the Judgment Could Not be Vacated

Again, the FDCPA proscribes lies and misleading statements when collecting debts. 15 U.S.C. § 1692e and f. This claim is presented simply:

---

[8]CCS's argues that Heling did not *actually* do anything different based on the representation; namely, she did not immediately pay, or offer to pay, the debt. (Docket #21 at 18-19). *Lox*'s definition of the materiality requirement, however, does not require historical proof but instead theoretical possibility. *Lox*, 689 F.3d at 827 ("In *Hahn* and *Donohue*, the alleged false statements did not, and could not, have any effect on the amount of debt owed by the plaintiff, regardless of when plaintiff decided to pay off the debt. Here, Lox would not have had to pay any additional money if he paid his debt immediately upon receipt of the dunning letters, but if CDA's statement regarding attorney fees were accurate, a decision to contest the debt could have turned out to be much more costly. Whether or not this fact would have led Lox to alter his course of action, it would have undoubtedly been a factor in his decision-making process, and very well could have led to a decision to pay a debt that he would have preferred to contest. The false statement was therefore material.").

Heling asserts that CCS told her it "could" not vacate the judgment because it had been published. (Docket #1 at ¶¶ 39-41). CCS claims that Wagner said "would," not "could," that the statement, that CCS would not vacate the judgment, was entirely truthful. (Docket #21 at 19-24). Heling offers substantial evidence Wagner's current recollection is questionable, and at very least it is at odds with her own. (Docket #33 at 12-14). These differing accounts, and especially the questions of Wagner's credibility, preclude summary judgment on this issue.

CCS asserts that Heling's interpretation of the conversation is not reasonable or logical. *Durkin v. Equifax Check Services, Inc.*, 406 F.3d 410, 414-415 (7th Cir. 2005) ("[W]e disregard unrealistic, peculiar, bizarre, and idiosyncratic interpretations of collection letters."). Notwithstanding that this point of law is typically applied to written materials, not live conversations, the Court finds that Heling's assessment was not illogical. "Could" and "would" mean different things, and the difference, viewing the evidence in Heling's favor, resulted in a misrepresentation. CCS next claims that the use of "could" or "would" is immaterial, arguing that Heling did not do anything in response to the statement. (Docket #21 at 24; #37 at 8). Heling asserts that statement led her to believe "that there was no point in fighting the underlying case" and that her only option was to pay the debt. (Docket #33 at 16). As above, Court finds that the use of a different word could have impacted Heling's decision-making and was, therefore, material.

4.3     Failure to Provide the Required Written Notice

The FDCPA requires that a debt collector send certain disclosures to a consumer within five days of the parties' initial communication (known as "validation" letters). 15 U.S.C. § 1692g(a). The seminal Ninth Circuit case holds that the collector need only *send* a validation letter, not ensure receipt.

*Mahon v. Credit Bureau of Placer County Inc.*, 171 F.3d 1197, 1201-02 (9th Cir. 1999). CCS asserts that the required letter was sent on October 17, 2014. (Docket #37 at 9). Heling claims that she did not receive it, and argues that she has rebutted any "mailbox rule" presumption running counter to that claim. (Docket #33 at 7-10).

### 4.3.1 The *Mahon* Rule

Heling's "mailbox rule" discussion appears to be based on a misunderstanding of *Mahon*. The Mahons asserted two claims, one for failure to send a validation letter, and a second for failure to provide verification of the debt pursuant to 15 U.S.C. § 1692g(b). *Mahon*, 171 F.3d at 1200. The first claim is analogous to Heling's. The court analyzed the text of Section 1692g(a) and found that it unambiguously requires only *sending* of the required notice. *Id.* at 1201-02. Thus, evidence of non-receipt, including rebutting the mailbox rule presumption, is irrelevant. *Id.* at 1202.

Heling does not make the Mahons' second claim, which was based on Section 1692g(b). *Id.* at 1202. Upon receipt of a validation letter, a consumer has thirty days to present a written dispute of the subject debt to the collector. *Id.* The *Mahon* court held that, given the undisputed evidence of sending, the mailbox rule created a presumption of receipt a few days later. *Id.* It then discussed why the presumption was not rebutted. *Id.* The issue was critical because the Mahons did attempt to dispute the debt, but did so almost nine months after the validation letter was presumed sent. *Id.* at 1202-03. Because of the operation of the mailbox rule, the Mahons' dispute was clearly outside the window offered by the statute. *Id.* Thus, *Mahon* did not hold that the mailbox rule has any application when assessing a claim based on a purported failure to send a validation letter.

The Seventh Circuit discussed the *Mahon* rules in *Anderson*, though it does not explicitly state its agreement with the Ninth Circuit. *Anderson v. Credit Bureau Collection Services, Inc.*, 422 Fed.Appx. 534 (7th Cir. 2011). There, the court cited the first *Mahon* holding and found that the collector introduced insufficient evidence of sending. *Id.* at 535. The collector did not "submit a copy of a communication addressed to [the consumer] or any physical evidence that correspondence was sent…, e.g., a receipt from the Postal Service or another carrier, an entry from a mailing log, or even a copy of a metered envelope addressed to [him] in Wisconsin." *Id.* at 536. Instead, the collector relied on an affidavit from one of its employees testifying to the content of its electronic records. *Id.* It was later discovered that the letter was sent by a third-party vendor, and that the employee had no knowledge of their procedures nor any control over their practices. *Id.* at 537-38. The court further commented on the collector's evidence:

> [The collector's affiant] does not attest that he personally sent anything to [the consumer]. …Nor does [the affiant], who works in Florida, aver that he supervised the employees who would have sent a letter, or that he possesses personal knowledge of the business practices and customs of the particular office—Columbus, if the letterhead is accurate—from which any letter would have originated in the regular course of business. …[The collector], moreover, did not submit a business record evidencing that it generated a letter from the appropriate template and mailed it on a specific date, and neither does [the affiant's] conclusory affidavit establish that he is qualified by personal or organizational knowledge to explain the company's record-keeping system or vouch for its use in this instance.

*Id.* at 538 (citations omitted); *see also Zamos v. Asset Acceptance, LLC*, 423 F.Supp.2d 777, 785-86 (N.D. Ohio 2006); *Van Westrienen v. Americontinental Collection Corp.*, 94 F.Supp.2d 1087, 1096–98 (D. Ore. 2000).

In light of *Anderson*'s application of the *Mahon* rules, this Court declines to expand upon *Mahon*'s true holdings. Instead, the Court will agree with *Anderson* and *Mahon* that, under the plain language of Section 1692g(a), resolution of those claims is based entirely on evidence of sending.[9] It will apply that rule to the instant case, which is, incidentally, rather straightforward.

### 4.3.2    Sending the October Letter

As noted above, Heling cannot seek shelter in her attempts to undermine a mailbox rule presumption. Heling's arguments that attack CCS's evidence of *sending* the notice, however, are not only appropriate, but effective. CCS's only evidence of sending is: 1) Wagner's testimony that the letter was sent "according to our normal practice and procedure" on the day the account was assigned from the creditor, October 17, 2014; and 2) a copy of the letter itself. (Docket #21 at 24, #37 at 9, #23 at ¶ 5, and #23-3). Heling casts doubt on this evidence by pointing to the account notes, which have

---

[9]The Court recognizes the potentially absurd result, as discussed by a consumer in a similar case:

> The defendant is arguing that it has no liability as long as it sends a letter somewhere; anywhere. It can be any address, anywhere in the country, or the world for that matter, without regard to whether it is received. The plaintiff does not deny that the defendant has no duty to ensure the notice is received, but when there is a genuine dispute of the fact as to whether the plaintiff lived at the address at which the letter was sent, when there is no possibility whatsoever that the plaintiff could have received the notice, there is a genuine issue of material fact that must be resolved as to whether the notice was sent "to the consumer." To hold otherwise is to hold that 15 U.S.C. § 1692g means nothing.

*Johnson v. Professional Collection Consultants*, No. 09-CV-1596, 2010 WL 2196571 *5 (S.D. Cal. May 28, 2010). Again, the Court need not tackle this problem, as this case does not require it to. *See infra* Part 4.3.2.

entries for all of the letters except the October Letter. (Docket #33 at 6 and #23-1 at 3). She also argues that it is unlikely that the letter could have been generated, printed, stamped, and mailed out that same day. (Docket #33 at 6-7 and #32-3 at 26:1-28:23).

The Court concludes that, in light of the above argument, Heling has genuinely disputed whether the October Letter was sent. The Court notes a few additional points relevant to *Anderson.* CCS has not produced physical or even testimonial evidence that the letter was actually sent.[10] *Anderson,* 422 Fed.Appx. at 536. CCS has also not produced "a business record evidencing that it generated a letter from the appropriate template and mailed it on a specific date[.]" *Id.* at 538. Wagner provides no detail on what CCS's "practice and procedure" for sending letters is, why she would be competent to testify on them, or how it was followed for this particular letter. *Id.* Finally, neither party has submitted evidence on what time of day CCS received Heling's account, leaving the door open to Heling's argument regarding insufficient time to mail the letter.

In sum, making all reasonable inferences in Heling's favor, a jury could conclude that the letter was not sent. Further, taking her testimony as true, the parties' initial communication occurred on July 27, 2015, meaning that CCS needed to send a validation letter within five days of that date. Because CCS admits that the Section 1692g(a) disclosures were provided in

---

[10]No one has testified that they personally sent the letter. Wagner merely asserts that "Creditor's Collection Service, Inc." sent it "according to our normal practice and procedure." (Docket #23 at ¶ 5).

the October Letter and no other, a finding that the October Letter was not sent would mean that Heling never received the disclosures.[11]

5.    CONCLUSION

Heling has raised genuine disputes of fact as to each of her claims. Viewing the evidence in her favor, CCS may have misrepresented whether the satisfaction fee was optional in the August 3, 2015 telephone conversation. CCS could have made a further false statement regarding vacating the judgment in that call. Finally, it is unclear whether the October Letter was ever sent. CCS's motion must, therefore, be denied in its entirety.

Accordingly,

IT IS FURTHER ORDERED that the plaintiff's motion to strike (Docket #31) be and the same is hereby GRANTED;

IT IS FURTHER ORDERED that the defendant's motion to withdraw admissions (Docket #39) be and the same is hereby GRANTED; and

IT IS ORDERED that the defendant's motion for summary judgment (Docket #20) be and the same is hereby DENIED.

Dated at Milwaukee, Wisconsin, this 6th day of September, 2016.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge

---

[11]This discussion demonstrates that to the extent Heling attempts to advance a separate Section 1692g(a) claim for failing to provide a new validation notice, *see* (Docket #33 at 10-11 and #37 at 9-13), it is one-and-the-same with the claim involving the October Letter.

Case 2:15-cv-01274-JPS   Filed 09/06/16   Page 17 of 17   Document 43